Wendy R. Fleishman (*pro hac vice*)
wfleishman@lchb.com
Daniel E. Seltz (*pro hac vice*
anticipated)
dseltz@lchb.com
LIEFF CABRASER
HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY   10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Fabrice N. Vincent (*pro hac vice*)
fvincent@lchb.com
LIEFF CABRASER
HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA   94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Plaintiffs*
*Marjorie and Charles Glover*

Hugh W. Cuthbertson    ct04133
hcuthbertson@zcclawfirm.com
Glenn A. Duhl   ct03644
gduhl@zcclawfirm.com
Zangari Cohn Cuthbertson
Duhl & Grello P.C.
59 Elm Street, Suite 400
New Haven, CT 06510
Telephone: (203) 789-0001
Facsimile: (203) 782-2766

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARJORIE and CHARLES GLOVER,<br><br>Plaintiffs,<br><br>v.<br><br>BAUSCH & LOMB, INCORPORATED, VALEANT PHARMACEUTICALS INTERNATIONAL, INC. N/K/A BAUSCH HEALTH COMPANIES INC., AND DOES 1 THROUGH 50, INCLUSIVE,<br><br>Defendants. | CASE NO. 3:18-cv-00352-VLB<br><br>THIRD AMENDED COMPLAINT FOR <u>INJUNCTIVE RELIEF AND DAMAGES</u><br><br>JURY DEMAND |

# TABLE OF CONTENTS

**Page**

I.    PARTIES ................................................................................................ 1

    A.   Plaintiffs ........................................................................................ 1

    B.   Defendant Bausch & Lomb Inc. .................................................... 1

        ii.   Valeant Pharmaceuticals International, Inc. ......................... 5

        iii.   Doe Defendants .................................................................. 6

II.   JURISDICTION AND VENUE ............................................................... 7

III.   INTRODUCTION ................................................................................... 7

IV.   FACTUAL BACKGROUND ................................................................... 9

    A.   Trulign Lenses for Cataract Surgery ............................................. 9

    B.   Plaintiffs' Experience with Trulign Lenses .................................. 12

    C.   Defendants Knew and Failed to Warn about Z Syndrome Complications for Crystalens, and Later for Trulign Toric Intraocular Lenses. .................. 15

        i.    Crystalens .......................................................................... 15

    D.   Defendant Bausch & Lomb Acquired Crystalens Developer to Build and Expand the Intraocular Lens Business. ...................... 15

        ii.   Trulign Lenses .................................................................... 19

    E.   Bausch & Lomb's Failed to Report Timely all Adverse Events to the FDA. .................... 25

    F.   The Trulign Lens is a Very Profitable Part of Bausch & Lomb's Business. . 27

    G.   Plaintiffs have suffered damages as a result of Trulign' s defect and Defendants' Failures to Warn and to Report Adverse Events to the FDA. . 28

    H.   Equitable Estoppel – Tolling Of The Statute Of Limitations ........................ 29

        ii.   Connecticut Discovery Rule ............................................... 31

    I.   Continuous Injury ........................................................................ 31

V.    SUMMARY OF ALLEGATIONS .......................................................... 32

VI.   CLAIMS FOR RELIEF ........................................................................ 35

FIRST CAUSE OF ACTION Strict Products Liability – Failure To Warn under   the Connecticut Products Liability Act .................................................................... 35

SECOND CAUSE OF ACTION Negligence – Under Connecticut Products Liability Act ............................................................................................................... 37

THIRD CAUSE OF ACTION Loss of Consortium .......................................... 39

VII.   EQUITABLE TOLLING OF STATUTES OF LIMITATIONS AND PUNITIVE DAMAGES ARE PROPER IN THIS CASE. ........................................ 40

PRAYER FOR RELIEF ................................................................................. 47

**TABLE OF CONTENTS**
**(continued)**

**Page**

DEMAND FOR A JURY TRIAL ...................................................................... 49

CERTIFICATE OF SERVICE ....................................................................... 50

Plaintiffs Marjorie Glover and Charles Glover (hereinafter collectively "Plaintiffs"), by and through their counsel, bring this action as a result of defective intraocular lenses manufactured and sold by Bausch & Lomb Inc., which caused and continue to cause Plaintiff Marjorie Glover to suffer permanent vision loss and continuous deterioration of both eyes.   Plaintiffs bring these claims under state laws to obtain injunctive relief to cease the sale of this product and for compensatory and punitive damages; and, allege as follows:

## I.   PARTIES

### A.   Plaintiffs

1.   Plaintiff Marjorie Glover and Charles Glover, wife and husband, are individuals and residents of Fairfield County, Connecticut.

### B.   Defendant Bausch & Lomb Inc.

2.   Defendant Bausch & Lomb Incorporated ("Bausch & Lomb," "Bausch & Lomb Inc.," and/or "B&L")) has its headquarters at 1400 Goodman St. N, Rochester, NY 14609 and conducts business in Connecticut.

3.   Bausch & Lomb Inc. acquired EYEONICS, which originally developed the predecessor product called the Crystalens Accommodating Intraocular Lens.

4.   The specific products manufactured at Bausch & Lomb in Rancho Cucamonga, CA include the BL1UT Trulign Toric; Model: BL1UT Trulign Toric. (Source: http://www.bausch.com/ecp/edfu?udt_19771_param_page=2.)

5.   This product at issue in this case is the Trulign Toric intraocular lens ("Trulign," "Trulign Lens," "Trulign Toric Lens," "Trulign Toric Intraocular Lens," or "Lens").   It is the subject of this lawsuit.   Its predecessor product, the Crystalens Accommodating Intraocular Lens ("Crystalens"), was also manufactured at Rancho

**1**

Cucamonga, CA (UVAM). (Source:

http://www.bausch.com/ecp/edfu?udt_19771_param_page=3.)

6. Bausch & Lomb maintains its California headquarters through the present

at 50 Technology Drive in Irvine, CA 92618.

7. The entity at this address is registered with the FDA and is listed as the

PMA Applicant for both the Crystalens and the Trulign products (see below).

Establishment:

Bausch & Lomb, Inc.
50 Technology Dr.
Irvine, CA   92618
Registration Number: 3004343135
FEI Number*: 3004343135
Status: Active
Date of Registration Status: 2017

Source: https://www.accessdata.fda.gov/scrIpts/cdrh/cfdocs
/cfRL`/rl.cfm?rid=91006

Device: CRYSTALENS ACCOMMODATING INTRAOCULAR
LENS & TRULIGN TORIC INTRAOCULAR LENS
Classification Name:   Intraocular, Toric Optics
Generic Name:   Lens, Intraocular, Toric Optics
Regulation Number:   886.3600

8. Applicant:

Bausch & Lomb, Inc.
50 Technology Dr.
Irvine, CA   92618
PMA Number: P030002
Supplement Number:   S038
Date Received:   02/01/2016
Decision Date:   07/27/2016
Source:   https//www.accessdata.fda.gov/scripts/cdrh/cfdocs/
cfpma/pma.cfm?id=P030002S038

9. The MAUDE Adverse Event Reports submitted by Bausch & Lomb in

connection with the Crystalens products and with the Trulign Toric Intraocular Lens lists

**2**

the manufacturer as Bausch & Lomb in Rancho Cucamonga, CA and the manufacturer contact at 50 Technology Drive, Irvine CA.

10.    On March 20, 2016, the FDA approved moving the manufacturing site to Clearwater, Florida.   However, all the conduct that led to the defective lens being marketed and sold to Plaintiff Mrs. Glover occurred when Bausch & Lomb was operating out of its Southern California headquarters.

11.    Bausch & Lomb continues to operate its ocular business from California, and in particular, in its Irvine, California facility.

12.    On its website, Bausch & Lomb states: "In August 2013, Bausch + Lomb became the eye care division of Valeant Pharmaceuticals International, Inc." *See* "The Bausch + Lomb Story," Bausch & Lomb, http://www.bausch.com/our-company/about-bausch-lomb/the-bausch-lomb-story (last accessed Mar. 15, 2015).

13.    As recently as March 15, 2017, Bausch & Lomb advertised its interest to hire employees for the Irvine, California facility; a Sacramento, California facility;   and a Petaluma, California facility.

     a.    One advertisement was for a position was called "Director Medical Affairs – Ophthalmology" for B&L Surgical stated:

> Valeant Pharmaceuticals International, Inc. is a diverse pharmaceutical company that is committed to focusing on our key stakeholders while delivering consistently high performance. Our values provide the overall direction for our company, and provide us with the tools necessary to rise to any challenge by leveraging our collective hard work and effort along with our unwavering competitive spirit. These values help us set goals based on our organization's potential and what we hope it will become.
>
> Responsibilities
>
> Serve as medical expert for the B+L Surgical Division, in support of the following activities . . . .

See Valeant.com, https://jobs-valeant.icims.com/jobs/8499/director-medical-affairs---ophthalmology/job?mobile=false&width=990&height=500&bga=true&needsRedirect=false&jan1offset=-480&jun1offset=-420 (last accessed Mar. 15, 2018).

b.      The following other positions advertised on Glassdoor.com for Bausch & Lomb and Valeant Pharmaceutical International, Inc.:

i.      National Accounts Manager - Surgical in Irvine, CA ("Responsible for business development and sales growth of Integrated Delivery Networks, ASC groups, Mobile Service Providers, and other strategic healthcare entities. These objectives and sales growth initiatives are predicated on the successful execution of national contracts by the B+L sales force, working in conjunction with the Regional Business Directors, Marketing, and the contracts department.");

ii.      Director Medical Affairs in  Irvine, CA ("Serve as medical expert for the B+L Surgical Division");

iii.      Quality Specialist  Petaluma, CA;

iv.      Senior Principal Scientist (Team Leader) Petaluma, CA;

v.      Surgical Equipment Specialist - Northern California in Sacramento, CA ("The Surgical Equipment Specialist (SES) is a professional sales position whose primary purpose is the presentation, promotion, and sale of the Bausch + Lomb portfolio of surgical equipment products such as cataract surgical equipment, vitreoretinal surgical equipment and related instruments and disposable products. The SES reports to the Regional Business Director (RBD)."); and

vi.      Customer Relations Associate, in Irvine, CA.

14.      In particular, the oversight over the Trulign Lens has been and is still conducted out of Bausch & Lomb's Irvine location:

**4**

a.      A July 30, 2013 adverse event report concerning the Trulign Lens also reflects the manufacturer's address as B&L in Rancho Cucamonga, California. and the contact for the FDA as Sharon Spencer at B&L, 30 Enterprise, Ste. 450, Aliso Viejo, California. Sharon Spencer was B&L's contact with FDA concerning all of the significantly delayed adverse event reports in violation of the conditional approval that demonstrate that B&L in 2013 and 2014 knew of the failures of the Trulign but failed to report those adverse events to FDA until 2017.

b.      In the end of February 23, 2017, an adverse event report for the Trulign Lens reported on the MAUDE database lists Sharon Spencer as the manufacturer's contact, who is associated with B&L's Aliso Viejo facility.

c.      As recently as January 2018, the new manufacturer contact for adverse event reports for the Trulign is Faranak Gomarooni out of B&L's Irvine, California facility.

ii.      **Valeant Pharmaceuticals International, Inc.**

15.     Valeant Pharmaceuticals International, Inc. n/k/a Bausch Health Companies Inc. ("VPII") is a Canadian Corporation, with its United States headquarters and principal place of business in Bridgewater, New Jersey.

16.     Defendant VPII acquired Bausch & Lomb and all of its divisions and subsidiaries and included all of them as part of the VPII business.   Defendant VPII holds itself out as a global company that does business around the world and throughout the United States.

17.     Defendant VPII describes itself on its website as "a multinational, specialty pharmaceutical and medical device company anchored by a collection of world-class franchises and 22,000 employees worldwide who come to work each day with a common

2463880.5

goal of improving people's lives through VPII's healthcare products. VPII develops, manufactures and markets a broad range of branded, generic and branded generic pharmaceuticals, over-the-counter (OTC) products and medical devices, which are marketed directly or indirectly in more than 100 countries."

18.     After the acquisition in 2013, Bausch & Lomb became a division of VPII.

19.     The headquarters for the newly-acquired, wholly-owned division of VPII, Bausch & Lomb, which develops, manufactures and sells the intraocular lenses at issue, is based in Irvine, California.

20.     Bausch & Lomb holds itself out as a division of VPII.

21.     VPII directly owns and oversees all of the other Defendants in this action and therefore, is the responsible party for the harm the subject device caused Mrs. Glover and Mr. Glover.

      **iii.**      **Doe Defendants**

22.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued by fictitious names, who are described throughout as DOES 1 through 50, and such names are fictitious.   Each of these fictitiously named DOE Defendants is responsible in some manner for the acts complained of in this Complaint, and each proximately caused Plaintiffs' injuries and damages, and each was acting as the agent for the others.

23.     Plaintiffs, by and through their undersigned counsel, hereby institute this civil action against Bausch & Lomb, Incorporated, Valeant Pharmaceutical International, Inc. n/k/a Bausch Health Companies Inc. ("VPII"). and DOES 1 through 50 (collectively, "Bausch & Lomb" or "Defendants").

## II.   <u>JURISDICTION AND VENUE</u>

24.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367 because this is a personal injury/products liability action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which the parties are citizens of different states.

25.    This Court has personal jurisdiction over Defendants because they transact business in the United States, including in the District of Connecticut; have substantial aggregate contacts with the United States, including within this District; engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and specifically in this District where the devices were sold to Plaintiff's doctor; and, Defendants purposely availed themselves of the laws of the United States and the laws of the State of Connecticut.

26.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District. Defendants transact business in this District.

## III.   <u>INTRODUCTION</u>

27.    This products liability action arises as a result of defective Lenses sold by VPII through its division Bausch & Lomb.

28.    The dangerously defective Lenses caused Plaintiff Mrs. Glover to suffer permanent vision impairment and permanent and irreparable damage, and continuing deterioration, to both of her eyes.   As a result of the defective Lenses, Plaintiff Mrs. Glover has been forced to endure more than eight(8)   painful and ultimately unsuccessful surgeries and significant remedial procedures, more than forty (40) visits

**7**

with specialists and more than one hundred (100) tests and procedures in an effort to remediate the loss of vision.

29.     Plaintiff Mrs. Glover continues to suffer extremely painful and debilitating complications from the defective Lenses and is likely to continue to suffer further complications and the loss of her remaining vision in the future.

30.     The defective product at issue is Defendants' Trulign Toric Intraocular Lens model BL1UT ("Trulign," "Trulign Lens," "Trulign Toric Lens(es)," "Trulign Toric Intraocular Lens(es)" or "Lens(es), which is the 2013 model of Defendants' "Crystalens" lenses.   The Trulign Lens is the latest in a line of "accommodating" lenses that are surgically implanted in the eyes to replace one's natural lens after the natural lens is removed during cataract surgery.

31.     The Trulign Lens suffers defects and risks unique to accommodating lenses manufactured and sold by Defendants.   Defendants failed to disclose defects with the Lenses, and in so doing, violated regulations issued by the U.S. Food & Drug Administration ("FDA") as well as the applicable state laws, including California where the Lenses were manufactured and distributed, and Connecticut and New York laws where Plaintiff Mrs. Glover was injured and sought treatment and care.

32.     Because of Bausch & Lomb's wrongful conduct, thousands of patients, like Mrs. Glover, underwent implants of these devices without knowing the defects and risks that they faced.   These patients' ophthalmic surgeons were persuaded by Bausch & Lomb and Bausch & Lomb's "Opinion Leaders" who are paid physician promoters, and Bausch & Lomb's sales representatives to use Trulign Lenses for cataract surgery and to correct patients' astigmatism and presbyopia.

33.     Representatives from Bausch & Lomb were physically present during Mrs. Glover's surgery to implant at least one of these devices. Representatives of Bausch & Lomb were also physically present when Plaintiff underwent the procedure in which the doctors attempted to remove the broken lens from her eye.

34.     As a result, Plaintiff Mrs. Glover's has suffered grievous personal injuries to her eyes that significantly impaired her vision and permanently and irreparably damaged, and continue to damage, both of her eyes.

35.     Her husband, Plaintiff Charles Glover, has suffered the loss of consortium, assistance and support of his wife; and their son and three daughters have suffered the loss of consortium, assistance, and support of their mother.

36.     Plaintiff Mrs. Glover has been unable to work to her full capacity and is at risk for diminished earning capacity for the remainder of her life.

IV.     **FACTUAL BACKGROUND**

   A.     **Trulign Lenses for Cataract Surgery**

37.     A cataract occurs when the naturally clear lens of the eye becomes cloudy. A lens implant is an artificial lens made of clear plastic that takes the place of the natural lens of the eye.   The typical implant has a clear lens called the optic and two narrow extensions called haptics that hold the lens in position within the eye.   Figure A displays the typical cataract lens implant:

Figure A



38.    Defendants' Trulign Lens also differs from other intraocular lenses,

because it has relatively large and rectangular shaped haptics that connect with the optic

by a hinge, and position within the eye with four hooks called "Loops."   The hinge is

designed to allow the Lens to flex.   Flexing allows the Lens to change focus from close-

up to distance.   This is known as "accommodation".   Bausch & Lomb's original

accommodating lens was the Crystalens, introduced in 2003.   The Trulign Lens was

introduced in 2013 as the first accommodating lens that also corrects for astigmatism.

Figure B shows a Trulign Lens:

Figure B

![Trulign Lens diagram with labels "Haptics and Loops", "Optic", and "Hinges"]

39.    The hinge design that distinguishes this Lens makes this uniquely

dangerous in the event it is necessary to remove or replace the Lens from the eye

**10**

following implantation. After implantation, removal of the bulky haptics and loops of the Lens may not be possible without causing extensive permanent damage to the eye.

40.    The hinge design that distinguishes this Lens also makes it uniquely dangerous by allowing one haptic of the implanted Lens to be pulled forward, while the other remains either in the normal position or is pushed backward, resembling the letter Z with the tilted optic in the middle.   This asymmetric vaulting or twisting, known as "Z Syndrome," is a post-operative complication unique to the Trulign and Crystalens lenses ("IOLs").   Even a small degree of Trulign Lens tilt can have profoundly negative refractive effect.   Z Syndrome can occur "despite perfect placement of the IOL during surgery," according to Dr. William B. Trattler, a physician with financial ties to Bausch & Lomb.   Figure C demonstrates Z Syndrome:

Figure C



41.    Defendants' Trulign Lens is manufactured and sold in only one size and is not available in a selection of sizes to match patients' eyes.   Instead, the "one-size-fits-all" Trulign Lens is sold to patients regardless of patients' varying eye sizes and shapes.

2463880.5

**B.**     **Plaintiffs' Experience with Trulign Lenses Began with the First Implantation of the Trulign Lens.**

42.     On September 11, 2014, Plaintiff Mrs. Glover presented at her ophthalmologist in Connecticut with symptoms consistent with cataracts.   Mrs. Glover underwent cataract surgery with implantation of Trulign Lenses for her left eye on September 17, 2014, and for her right eye on September 24, 2014.

43.     As of September 25, 2014, she had 20/20 vision in her right eye, and 20/25 vision in her left eye.

44.     Some weeks after September 25, 2014, Mrs. Glover began to experience severe complications from the Trulign Lenses, including significant loss in visual acuity, blurriness, hazing, halos and significant eye pain.   Mrs. Glover was diagnosed ultimately with Z Syndrome in both of her eyes.

45.     As a result of the defective Lenses, Plaintiff Mrs. Glover endured eight(8) painful and ultimately unsuccessful surgical, medical and other interventions, more than forty (40) visits to specialists and more than one hundred (100) tests and other procedures in an unsuccessful effort to correct her vision and remediate the considerable harm caused to her eyes.   These unsuccessful efforts included YAG capsulotomies in both eyes, additional follow up YAG procedures, three extremely painful reconstructive surgeries, including an intraocular lens exchange and vitrectomy (replacement of natural vitreous gel with artificial gel), and two painful follow-up surgeries to truncate the broken lenses that remain embedded in Mrs. Glover's eyes.   The surgeries were extremely painful and required large needles to be injected directly into Mrs. Glover's eye, while she was awake.

2463880.5

46.     Despite the dedicated efforts of Mrs. Glover's ophthalmic surgeons to restore her vision loss from the defective Lenses, Mrs. Glover has suffered significant vision impairment, including the loss of visual acuity in both eyes, complete loss of depth perception, extreme photosensitivity, limited ability to see at night and double vision. She also suffers continuously from the loss of balance, vertigo, headaches, extreme eye pain, eye fatigue and tearing.   As a result of her vision impairment caused by the defective Lenses, Mrs. Glover falls frequently and has fallen down flights of stairs, narrowly missed being hit by cars and buses, suffered bruises, burns and other injuries from routine daily activities and can no longer safely drive a car   .

47.     Plaintiff Mrs. Glover has also suffered continuous deterioration of the structure of both her eyes, including posterior vitreous detachments in both eyes. Both required emergency care on weekends with attendant increased risks of retinal detachment, optic nerve damage, cotton wool spots and other retina complications and a notable increase in macular thickening which significantly increases the risk of complete loss of vision in the future.   As a result of the posterior vitreous detachments and optic nerve damage, Mrs. Glover struggles to see through a sea of floaters, flashes of lights, and shadows that continuously impair her visual field.

48.     Moreover, despite eight (8) surgical, medical and other procedural efforts to restore vision in Mrs. Glover's eyes, the twisted and vaulted lenses and haptics remain embedded in Mrs. Glover's eyes.   The broken, embedded and twisted Lenses continuously and significantly obscure, distort and skew vision in both her eyes, resulting in significant higher order aberrations that make it even more difficult to see.   The haptics from both Lenses cannot be safely removed from Mrs. Glover's eyes, which

13

further limits, and in many respects completely forecloses the use of corrective measures that would otherwise have been available if the Lenses were not defectively designed and manufactured.

49.     As the primary source of support for her family, including four children (one of whom is profoundly disabled and requires around the clock home care, personal support and services), Mrs. Glover has remained committed to supporting and caring for her family.   Despite the challenges she faces from the significant vision loss, Mrs. Glover has continued to work (with support from adaptive equipment) in order to support and care for her family.   She is extremely concerned that she will completely lose her ability to see in the future and will be unable to support or care for her family, including her disabled son.

50.     At the time these Lenses were implanted, Plaintiff Mrs. Glover did not know of the dangers and increased risk of vaulting or Z Syndrome or that Trulign Lenses posed a significantly increased risk of vaulting or Z Syndrome.   At the time the Lenses were implanted, Mrs. Glover did not know that, if complications occurred, it may not be possible to remove, replace or exchange the Lenses or haptics from her eyes or that it could require numerous painful surgeries and procedures to try to correct the problem. She did not know that her vision would become significantly impaired and that her eyes would become permanently damaged.

51.     Plaintiff and her ophthalmic surgeon were not informed by Defendants that these Lenses and the predecessor lenses, the Crystalens, had an increased risk of vaulting and that vaulting caused by the Lenses was a known and probable risk, not an extremely rare risk.

52.     Defendants failed to train the ophthalmologic surgeons the special

procedures and safe techniques to implant, and if necessary, explant these very special

Lenses.

**C.     Defendants Knew and Failed to Warn about Z Syndrome Complications for Crystalens, and Later for Trulign Toric Intraocular Lenses.**

**i.     Crystalens**

53.     Bausch & Lomb's predecessor, Eyeonics, Inc., knew as early as 2006 that

Z Syndrome was a complication unique to its AT45 Crystalens IOL Lens.   Indeed, Barrie

Soloway, M.D., one of the authors of a paper coining the term "Z Syndrome" was a

faculty member for Eyeonics.

**D.     Defendant Bausch & Lomb Acquired Crystalens Developer to Build and Expand the Intraocular Lens Business.**

54.     Crystalens was developed by Eyeonics, Inc., a privately held medical

device company headquartered in Aliso Viejo, California.

55.     Eyeonics, founded in 1998, developed and markets the Crystalens

intraocular lens (IOL), the first and only FDA-approved accommodating IOL for the

treatment of cataracts.   The Crystalens IOL replaces the eye's natural lens and has

been implanted in more than 95,000 eyes worldwide.

56.     In November 2003, the Crystalens was approved for sale in the U.S. by

FDA as a Class III medical device.   The FDA's initial pre-market approval required the

sponsor, then Eyeonics, to conduct post-marketing surveillance, to submit an adverse

event report within ten days of receiving information concerning any injury attributable to

the device if the injury was not addressed by the device's labeling, or if it was addressed

by the labeling, if the injury was occurring with unexpected severity or frequency.

57.    Similarly, FDA required device manufacturers to establish internal procedures for reviewing complaints and event reports,[1] and to report to FDA within thirty days after becoming aware of information suggesting that one of the manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would likely cause death or serious injury if the malfunction were to recur[2].

58.    On February 1, 2008, Bausch & Lomb acquired Eyeonics, Inc.™, the rapidly growing, privately-held ophthalmic medical device company headquartered in Aliso Viejo, California.

59.    Upon completion of the acquisition, Eyeonics' operations became part of Bausch & Lomb's surgical business, which offered a line of standard intraocular lenses, phacoemulsification equipment, vitreoretinal and refractive products to ophthalmologists worldwide.

60.    The Crystalens was considered a huge innovation in 2003.

61.    Accommodation is the eye's method to achieve near-distance focusing by altering the curvature of the natural crystalline lens, allowing a person to easily read small type used in books, restaurant menus, and on computer monitors.   As the natural lens ages, accommodation decreases.   This results in a condition known as presbyopia for most people over age 40, for which reading glasses are commonly required.   Other approved IOLs only permit focusing at a fixed distances, while the Crystalens IOL is intended to mimic the accommodating characteristics of a natural lens.

"This represents our first acquisition since Bausch & Lomb became

---

[1] See C.F.R. §820.198(a)

[2] See C.F.R. §803.50(a)

2463880.5

a private company in a transaction led by Warburg Pincus," said Ronald L. Zarrella, chairman and CEO, Bausch & Lomb.   "We are excited to enter a new phase of growth and innovation, and believe the Eyeonics acquisition is another sign of our commitment to delivering innovative, high-quality products to ophthalmologists and patients worldwide."

62.     Chairman and Bausch & Lomb CEO Zarrella continued, "[t]his acquisition immediately places Bausch & Lomb into the rapidly expanding premium IOL market. The Crystalens technology complements our existing cataract surgical business, including our Stellaris Vision Enhancement System and our portfolio of monofocal IOLs.   The acquisition also adds leadership depth, as Andy and his team bring a strong track record of product innovation and growth to the company.   We look forward to their contributions as part of the Bausch & Lomb family." http://www.visionmonday.com/latest-news/article/bausch-lomb-to-acquire-eyeonics-inc-maker-of-crystalens-accommodating-iol-5944/

63.     In 2007, Eyeonics generated revenues of approximately $34 million, an increase of 100 percent over the prior year revenues of approximately $17 million.   Its Crystalens IOL was estimated to represent approximately 30 percent of the presbyopic IOL market in the U.S.

64.     By 2008, Defendants knew that Z Syndrome was a complication unique to all Bausch & Lomb's accommodating IOL Lenses, not just to the initial model.

65.     According to an article published in 2008 in the Journal of Cataract & Refractive Surgery, "[Z Syndrome] is a unique complication with this type of hinged accommodating IOL.   * * * Because Z Syndrome is caused by capsule fibrosis primarily, every effort to reduce the occurrence of capsule fibrosis intraoperatively must be made

17

using appropriately sized capsulorhexis, cortical removal, and potentially capsule polishing."

66.     The article suggested steps that could be taken to minimize the risk of Z Syndrome at the time of implantation.

67.     More than four(4)   incidents of Z Syndrome were reported.   However, in April 2009, Bausch & Lomb submitted one adverse event report to FDA reporting on the occurrence of Z Syndrome.

68.     Regarding "potential complications" for Crystalens implants circulated in or around 2009, Bausch & Lomb's advertising circular stated as follows:   "The risks of implantation with Crystalens are generally the same potential risks that exist for implanting all intraocular lenses."

69.     As of April 2010, Bausch & Lomb apparently considered Z Syndrome to be sufficiently serious and widespread that it began working with Dr. Stephen Safran, an American Board Certified, fellowship-trained cornea specialist. His special interest is in cataract surgery with premium lenses.   He was called upon by Bausch & Lomb "to create an instrument to help aid the surgical correction of Z Syndrome." Bausch & Lomb would not have undertaken that task if only the small number of Z Syndrome episodes reported to the FDA at the time were known to Bausch & Lomb.

70.     On January 2, 2018, Bausch & Lomb announced it received FDA 510(k) clearance for its Crystalsert 2.6, that surgical device Dr. Safran had been working on since 2010:

> The CI-26 injector includes several enhancements designed to assist IOL delivery through a smaller incision," Chuck Hess, vice president and general manager, U.S. Surgical, Bausch + Lomb, said in the release. "Surgeons already know the benefits of our

Crystalens accommodating and Trulign toric lenses, and we are happy to provide them with a smaller incision option to deliver these benefits to their patients."

71.　　Nevertheless, throughout 2010 and later, Defendants placed advertising circulars intended for patients in ophthalmologists' offices throughout the U.S. for potential buyers of Crystalens to read, and did so knowing that Crystalens posed a unique risk—"Z" Syndrome—which risk was never disclosed to the public and the medical community.

### ii.　　Trulign Lenses

72.　　When Defendants announced the "Trulign" Lens model of their accommodating lenses in a 2013 presentation to FDA seeking approval for the device, Bausch & Lomb claimed that the Trulign Lenses "did not introduce new safety or effectiveness concerns compared with Parent IOL" (referring to the Crystalens).

73.　　Based on that representation, neither Plaintiff nor her ophthalmologist were made aware of the increased risk of vaulting.

74.　　Bausch & Lomb presented its pre-market clinical study, downplaying both the risk and the severity of asymmetric vaulting/Z Syndrome, suggesting that non-complying doctors and subjects were the real cause, and not the defect in its design of the lens.　Bausch & Lomb also assured the FDA that asymmetric vaulting (Z Syndrome) can be successfully treated, citing exactly the procedures and modalities that failed to resolve Mrs. Glover's symptoms.

75.　　These representations were knowingly false and constituted misbranding in violation of 21 U.S.C. §352(q), 21 C.F.R. §801.6, among others.

76.     At the time the FDA considered whether to approve Trulign, the FDA's Advisory Panel noted that it had the following information available regarding vaulting and Z Syndrome:

    a.      Trulign Toric Accommodating IOL

        i.      2 reports in the P030002/S027 clinical study

    b.      Crystalens Accommodating IOL

        ii.      1 report in P030002 clinical study;

77.     However, the reality was that there were approximately 270 medical device reports potentially related to vaulting and 5 cases were reported in the medical literature.

78.     While the FDA Advisory Panel ultimately agreed to approve the Trulign lenses, several panel members said it was hard to judge the benefits versus risks because of faulty/missing data:   "The missing data issue was an important one because there's more missing data than there are vaulting events," said Scott R. Evans, Ph.D., a senior research scientist in the Department of Biostatistics at Harvard University in Boston, Massachusetts.

79.     Consequently, as a condition of approval, the FDA required a post-market safety study of the Trulign Lenses, specifically regarding the vaulting/Z Syndrome risk:

    a.      Trulign™ Toric IOL New Enrollment Study:

    "The study will be a single arm, multi-site, prospective study with a sample size of 500 eyes at the end of 3 year follow-up.   The specific question to be answered is the incidence of IOL vaulting (i.e., position change such as clinically significant anterior vaulting, clinically significant tilt, and secondary surgical intervention related to such vaulting) up to three years post implant.   Follow-up assessments will occur at 1 day, 1 week, 1 month, 6 month, 1 year, and then every year until the 3rd year of follow-up.   Data collection will include observations, symptoms, diagnosis, treatment, sequelae, and resolution."

80.     Bausch & Lomb was required to submit a PMA supplement including a complete protocol of its post-approval study within 30 days and "to submit separate PAS Progress Reports every six months during the first two years of the study and annually thereafter."    FDA also advised that "the results from these studies should be included in the labeling as these data become available.   Any updated labeling must be submitted to FDA in the form of a PMA Supplement."

81.     Bausch & Lomb had claimed that no such study was necessary, because: "the Trulign™ Toric Accommodating IOL does not present new issues of safety or effectiveness compared to the known profile of the Crystalens IOL."   Specifically, with respect to Z Syndrome, Bausch & Lomb told the FDA that "concerns about "anterior vaulting" and "Z Syndrome" relate to rare issues that have been apparent for many years."

82.     Despite the FDA's requirements, Defendants did not begin the post-market safety study until March 2015, nearly two years after Bausch & Lomb began selling Trulign Lenses, and *six months after* Mrs. Glover had the Trulign Lenses implanted into her eyes.

83.     Bausch & Lomb failed to timely provide its mandatory PAS Progress Reports to the FDA four times, including as of the date of this lawsuit.   While the findings have not been published, in February 2016, Bausch & Lomb proposed changes to its Trulign and Crystalens labels.

84.     When the Trulign Lenses were implanted by Mrs. Glover's ophthalmic surgeon in Connecticut, neither Plaintiffs nor her ophthalmic surgeon were informed of

the increased risk of vaulting from the Lenses.   Plaintiffs Mr. and Mrs. Glover were not aware of the actual risk of Z Syndrome until years after the Lenses were implanted.

85.     As a result of Bausch & Lomb's failure to comply with its duty to conduct post-market surveillance and failure to comply with its duty to file adverse event reaction reports for all known incidents of Z Syndrome, information furnished to ophthalmologists and their patients was misleading, inaccurate, erroneous and incomplete.   Bausch & Lomb's failure to comply with its reporting requirements diminished the ophthalmologist's ability to assess and warn the patients of the risk of Z Syndrome, so that these statements constituted misbranding in violation of 21 C.F.R. §801.6.

86.     There is no mention in the Warnings or the Precautions on the Instructions for Use (labeling) for the Trulign Lens approved by the FDA in May 2013 of an irreparable damage caused by the significant risk of "vaulting" or "Z Syndrome."

87.     The 2013 Trulign Lens warning fails to state that if vaulting does occur, the ophthalmic surgeon is required to realign and/or reposition the lens.   There is no information about how an ophthalmologist can avoid Z Syndrome at time of implantation; that was crucial information that Bausch & Lomb already had in its possession and concealed from the ophthalmologist community, Plaintiff's ophthalmic surgeons, Plaintiffs and other patients.

88.     There is no mention of a substantially increased risk of vaulting.

89.     There is no mention that vaulting of the Lenses may destroy the patient's visual acuity and result in a permanent loss of vision.

90.     There is no mention of the number of failures of the device or of its predecessor device noted anywhere on the labeling.

91.     There is no mention that it may not be possible to remove the defective Lenses after implantation without causing extensive eye damage and continuous vision deterioration, thus complicating, limiting, and/or precluding any future Lens replacement or exchange.   There is no mention of the number of vaulted cases and/or Lens haptics that could not be safely removed.

92.     When the Trulign Lenses were implanted by the Mrs. Glover's ophthalmic surgeon in Connecticut in September of 2014, Bausch & Lomb had not disclosed the true risks and dangers of vaulting and the permanent loss of vision and other complications that could result.

93.     After the Lenses were implanted in Mrs. Glover's eyes in September of 2014, Mrs. Glover's vision initially was 20/20 and 20/25.   However, within a short period of time, the Lenses vaulted.

94.     Mrs. Glover's ophthalmic surgeon diligently attempted to correct the vaulted Lenses, by performing five YAG procedures on her eyes to attempt to reposition the Lenses.   Those procedures occurred at the Connecticut facilities. Despite the dedicated efforts of Mrs. Glover's ophthalmic surgeon, Mrs. Glover's vision was not recovered.

95.     Upon the advice of Mrs. Glover's ophthalmic surgeon in Connecticut, Mrs. Glover sought treatment with another specialist in New York, who explained to her that the Lenses were out of position.

96.     New expanded warnings were finally added regarding the risk of Z Syndrome in the fall of 2016.   This was the first time that Mr. and Mrs. Glover knew of the true risks of vaulting and that the risks were risks caused by the defective Lenses.

23

Upon review of medical research, counsel for Plaintiffs discovered that Trulign Lenses presented precisely the same problems for patients as had the Crystalens product, despite Bausch & Lomb's representation that the Trulign Lens had corrected all the health and safety problems.

97.     The 2016 "Adverse Events" section of the new labeling explains "vaulting," including what vaulting is, how a clinician should diagnose vaulting with specificity following implantation of the Trulign Lenses, additional clinical factors that support the diagnosis of vaulting, what vaulting looks like to the clinician, causes of vaulting, as well as sequelae of vaulting.

98.     The Warning section of the 2016 label addresses vaulting at point seven.

99.     None of this information or detail was made available to the clinicians such as Mrs. Glover's ophthalmic surgeon, despite Bausch & Lomb possession of evidence of precisely these problems long before the Trulign Lenses were first sold to and implanted in Mrs. Glover's eyes.

100.    The new expanded warnings remain grossly inadequate, despite Bausch & Lomb's knowledge that (a) the Lenses may be difficult (and in some cases impossible) to safely remove, exchange or replace and/or may result in permanently embedded or broken haptics or Lenses, (b) multiple surgeries and procedures may not successfully remediate the vaulted and twisted Lenses or broken or embedded haptics, (c) such remedial efforts may result in related complications including without limitation posterior vitreous detachments, optic fiber damage and macular thickening, and (d) in certain cases, implantation of the Lenses and efforts to correct the vaulted and twisted Lenses may result in significant vision loss and irreparable and permanent damage to the eyes.

E.      **Bausch & Lomb Failed to Report Timely all Adverse Events to FDA.**

101.    FDA's initial premarket approval ("PMA") of the Crystalens required

Bausch & Lomb to provide to the FDA all "Adverse Reaction Reports," within 10 days

after the applicant [i.e., Bausch & Lomb] receives or has knowledge of information

concerning: "[a]ny . . . injury . . . that is attributable to the device and (a) has not been

addressed by the device's labeling; or (b) has been addressed by the device's labelling

but is occurring with unexpected severity or frequency."

102.    Likewise, the supplemental PMA for Trulign required Bausch & Lomb to

submit adverse event reports within 30 days after receiving or otherwise becoming

"aware of information, from any source, that reasonably suggests that one of their

marketed devices:

> a.      may have caused or contributed to a death or serious injury;
> or
>
> b.      has malfunctioned and such device or similar device
> marketed by the manufacturer would be likely to cause or
> contribute to a death or serious injury if the malfunction were to
> recur."

103.    Bausch & Lomb ignored and neglected its responsibilities to the FDA and

the conditional approval it had received to market the Trulign Lenses when it failed to

timely file adverse event reports for all known incidents of Z Syndrome with Bausch &

Lomb's Crystalens and Trulign Lenses, violating its federal duties under 21 C.F.R. §

803.50(a).

104.    Moreover, Bausch & Lomb failed to timely file numerous adverse event

reports in Mrs. Glover's case, despite that Bausch & Lomb was informed of these

adverse results on numerous occasions.

2463880.5

105.    By failing to comply with its obligation to file adverse event reports involving Z Syndrome after implantation of Crystalens and Trulign Lenses, Bausch & Lomb violated the conditions set by the FDA in the FDA's initial approval for Bausch & Lomb to market Crystalens, and the FDA's supplemental approval to market Trulign Lenses in the United States.

106.    In the physician labeling available at the time of Mrs. Glover's implants in 2014, there was no mention of vaulting or Z Syndrome reported in the adverse events section.   Today, however, there is an entire section in the physician labeling devoted to describing adverse events involving "vaulting," including "Z Syndrome."   Specifically, doctors are told that: "[v]aulting events occurred at a rate of 0.3% (1 event / 324 subjects) in the clinical study conducted for the original Crystalens IOL (Model AT-45), and at a rate of 0.9% (2 events / 227 subjects; both arms combined) in the clinical study conducted for the Trulign Toric IOL (a modification having the same hinged haptic design; Model AT50T)."   These figures indicate that Trulign Lenses are more dangerous than the parent Crystalens Lenses and that Defendants had reason to know of these dangers at the time the Trulign Lenses were first marketed, subsequent to the conditional approval.

107.    Further, when Mrs. Glover had her implant surgery, the Trulign patient brochure claimed that: "[t]he risks of implantation with the Trulign Toric IOL are the same risks that exist for all intraocular lenses."

108.    The brochure did not discuss the unique, enhanced risk of Z Syndrome, nor the inadequacy of available treatments, but rather noted only that if the lens becomes stuck in an undesired position, you may need glasses or to have the lens

2463880.5

removed. However, in Mrs. Glover's case, the defective Lenses could not be safely removed or adjusted; and glasses have been at best only minimally effective.

109.    Beginning in mid-2016, however, patients were told that the Trulign hinge design poses an additional risk of vaulting, beyond those risks that exist with IOL implantation.   As of 2016, patients were further warned that vaulting "is most commonly treated via a secondary surgery, which has additional risks."

110.    When Mrs. Glover's implanting physician considered using Trulign Lenses, the only mention of vaulting in the physician labeling was that "a wound leak could cause forward vaulting of the optic."

111.    As of 2016, the above described new adverse event section and warning was added that provides detailed information regarding adverse events involving asymmetric vaulting (Z Syndrome); notes that patients have experienced "higher order aberrations;" and, provides instructions for minimizing risk, recognizing symptoms and treatment.

### F.    The Trulign Lens is a Very Profitable Part of Bausch & Lomb's Business.

112.    The Trulign has become a best seller for Bausch & Lomb.   One market analyst has publicly estimated that the product's sales were significant for the fiscal year ended in April, 2016.   Bausch & Lomb has been depending heavily on Trulign since sales in so many of its other products, such as the Crystalens, have slowed because of the recalls of those defective cataract lenses.

G.   **Plaintiffs have suffered damages as a result of Trulign's defect and Defendants' Failures to Warn and Failure to Report Adverse Events to the FDA.**

113.   Had Bausch & Lomb complied with their post-market obligations and adequately and timely reported adverse event reports for Crystalens and Trulign Lenses, Mrs. Glover and her physician would not have selected Trulign.   At the time of implant, neither Mrs. Glover, nor her physician had any reason to believe that the risk of Z Syndrome associated with Crystalens and Trulign Lenses were anything but rare, or that that the available treatments would not be successful.

114.   Had Plaintiff or her physician been aware of the adverse event reports showing that the Trulign Lenses were more dangerous than the parent Crystalens IOL Lenses, or reports of Z Syndrome with higher order aberrations, or that the available treatment options including removal of Lenses, may not be successful, or that Defendants had delayed the commencement of a safety study that the FDA ordered Defendants to undertake, Mrs. Glover would not have had the Trulign Lenses implanted.

115.   In addition to Plaintiff's physical and emotional injuries, including a significant reduction in her ability to see, continuous deterioration in her vision, disfigurement, pain and suffering, mental anguish and emotional distress, Plaintiffs have suffered financial losses because of Bausch & Lomb's false and misleading statements and omissions regarding the "Z" Syndrome risk unique to Bausch & Lomb's Trulign Toric Lens and before that, the Crystalens.

116.   Those losses include Plaintiff's out-of-pocket cost for the Trulign Lenses, as well as the cost of surgical procedures to implant and to try and correct the "Z" Syndrome.   Mrs. Glover has incurred significant medical, surgical, therapeutic and consequential medical expenses, and will likely incur significant out-of-pocket losses in

the future with continuous deterioration to Mrs. Glover's vision as a result of the defective Trulign Lenses.   Those losses also include Mrs. Glover's diminished earning capacity and lost earnings resulting from the Trulign Lenses, resulting complications, and resulting continuous deterioration to Mrs. Glover's vision.

117.   Mrs. Glover has served as the primary source of financial support for her children and the family relies upon her for their financial future.   Their eldest son is profoundly disabled and requires round-the-clock home care, personal supports and services.   Mrs. Glover's three school-age daughters are all actively involved in their schools, sports, church, and community activities.   All of the family's children are extremely close with and dependent upon their mother.   Mrs. Glover is extremely concerned about her continued ability to support and care for her future and the significant impact that her vision loss and future vision loss will have upon her family.

118.   Plaintiff Charles Glover has suffered a loss of consortium, assistance, care and support as a result of Defendants' misdeeds and negligence.   In addition, Charles Glover is required as a result of the injuries to Marjorie Glover to provide additional care for his wife, and even greater responsibility caring for their family.

## H.   Equitable Estoppel – Tolling Of The Statute Of Limitations

119.   Defendants are estopped from asserting time-based defenses where Plaintiffs did not discover nor reasonably could not, at any earlier time, discovered that their manifested injuries had a causal connection to the Defendants' defective product.

120.   At times, places, and involving participants known exclusively to Defendants and third parties and concealed from the Plaintiffs, Defendants engaged in conduct which caused irreparable harm to Mrs. Glover.

121.    Defendants had more than a decade's worth of science and research linking their intraocular lenses to an increased risk of vaulting resulting in substantially diminished if not completely destroyed vision.

122.    Defendants knew or should have known of the risks and dangers of these intraocular lenses.

123.    Defendants knew or should have known of the science and research well before Plaintiff was ever implanted with these Lenses.

124.    Defendants have concealed from or failed to notify Plaintiffs and her ophthalmic surgeon of the full and complete nature of true risks, symptoms and dangers of the Lenses.

125.    Although Defendants have recently acknowledged some of the risks and dangers of Z Syndrome and some related complications resulting from the Lenses in the 2016 Instructions for Use, Defendants did not disclose and still have not fully disclosed the seriousness of the issue.   Despite Defendant's knowledge of the risks of Z Syndrome and other significant complications, Defendants continue to downplay the widespread prevalence of the significant problems caused by the Lenses.

126.    In fact, there are more than five hundred (500) MAUDE Adverse Event Reports to FDA from 2013 through early 2016, linking vaulting to the Trulign Lenses. In each report, there is no mention of the final medical outcome or whether Lenses were successfully repositioned or removed.   That is because most of these MAUDE Adverse Event Reports indicate the same pattern of harm suffered by Plaintiff.   And, Defendants failed to provide accurate and complete information to FDA in full violation of the applicable federal regulations.

127.   This failure to provide accurate information continues through the present.

128.   Any applicable statute of limitation has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

129.   Defendants were and are under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of risks and dangers of the Lenses.   Defendants actively concealed the true character, quality, and nature of the risks and dangers and knowingly made misrepresentations about the characteristics, risks, and dangers. Plaintiffs and Plaintiff's physician reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

### ii.    Connecticut Discovery Rule

130.   The causes of action alleged herein did not accrue until Plaintiff discovered and/or was diagnosed the devastating symptoms that Plaintiff suffered without any knowledge of the cause and the true risk that she would never regain her vision. Plaintiff, however, had no realistic ability to discern that the symptoms from which she suffered were linked to the defective Lenses until – at the earliest – after Defendants released the updated labeling for the Trulign Lenses.

### I.    Continuous Injury

131.   Plaintiff Mrs. Glover continues to suffer harm as a result of the defective Lenses.   The extent of the damage to her eyes has not been determined and whether there remains any remedy or modality that the ophthalmologists can use to improve her vision remains unknown.

132.    Plaintiffs continue to be deprived of knowledge or information as to the extent of Plaintiff Mrs. Glover's lifelong injuries, damages and losses.

V.    **SUMMARY OF ALLEGATIONS**

133.    Plaintiffs suffered grievous personal injuries and damages and losses as a direct and proximate result of Defendants' misconduct.

134.    Plaintiff would not have chosen to be treated with Trulign Lenses had she known of or been informed by Defendants of the true risks of the use of Trulign Lenses.

135.    At all relevant times, Trulign was researched, developed, manufactured, marketed, promoted, advertised and sold by Defendants and their predecessors in interest.

136.    At all times relevant, Defendants manufactured and sold the Trulign Lens in only one size, regardless of patients' varying eye sizes and shapes, thus impairing the Lens' safety and effectiveness.

137.    At all times relevant, Defendants misrepresented the safety of Trulign Lenses to consumers and patients, including Mrs. Glover, and recklessly, willfully, or intentionally failed to alert Mrs. Glover or her ophthalmologists to the extreme danger to patients of the use of the Trulign Lenses.

138.    At all times relevant, Defendants negligently manufactured, marketed, advertised, promoted, sold and distributed it as a safe and effective device to be used for cataract surgery.   Defendants negligently, recklessly, and/or intentionally over-promoted Trulign Lenses to ophthalmologists and consumers, including to Mrs. Glover's ophthalmic surgeons and Mrs. Glover, and downplayed to ophthalmologists and patients its dangerous and permanent effects, including but not limited to the failure to warn of

dangerous effects of Trulign Lenses used for cataract surgery and inability to remove defective lenses.

139.    At all times relevant, Defendants misrepresented the safety of Trulign Lenses to consumers and patients, including Mrs. Glover, and recklessly, willfully, or intentionally failed to alert Mrs. Glover to the extreme danger to patients of a permanent Z Syndrome resulting from the implantation of these Lenses.

140.    Any warnings Defendants may have issued concerning the implantation of the Trulign Lenses were insufficient in light of Bausch & Lomb's contradictory prior, contemporaneous and continuing promotional efforts and over-promotion of the Trulign Lenses, even as Defendants knew of the serious adverse events caused by the Trulign and by its predecessor, the Crystalens.

141.    At all relevant times, Defendants knew, and/or had reason to know, that Trulign Lenses were not safe for the patients, because its safety and efficacy for use was either unknown, or was known by these Defendants to be unsafe and ineffective.

142.    At all relevant times, Bausch & Lomb knew, and/or had reason to know, that its representations and suggestions to ophthalmologists that Trulign Lenses were safe and effective for use in the eyes were materially false and misleading.

143.    Defendants knew and/or had reason to know of this likelihood and the resulting risk of injuries and blindness, but concealed this information and did not warn Plaintiffs' ophthalmic surgeon or Plaintiffs, preventing Plaintiff and her ophthalmic surgeon from making informed choices about the selection of other lenses, treatments or therapies.

144.   Plaintiffs and her ophthalmic surgeon relied on Defendants' misrepresentations regarding the safety and efficacy of Trulign Lenses in connection with their decisions to use the lenses in Plaintiff's cataract surgery.   Plaintiffs and her ophthalmic surgeon did not know of the specific risks, and/or were misled by Defendants as to the nature and incidence of the true specific risks related to the use of Trulign Lenses in cataract surgery.

145.   Defendants improperly promoted and marketed Trulign to Plaintiff's ophthalmic surgeon, and this promotion and marketing caused Plaintiff's ophthalmic surgeon to decide to implant these defective intraocular Lenses in Plaintiff's eyes.

146.   At all times mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venture of each of the other Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

147.   At all times mentioned, Defendants and each of them, were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

148.   There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and

these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants.   Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

149.   At all times herein mentioned, Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff and her ophthalmologists.   As such, each of the Defendants is individually, as well as jointly and severally, liable to the Plaintiffs for their damages.

150.   The harm which has been caused to Plaintiffs resulted from the conduct of one, or various combinations of the Defendants, and, through no fault of the Plaintiffs. There may be uncertainty as to which one or combination of Defendants caused the harm.   Defendants have superior knowledge and information on the subject of which one or combination of Defendants caused Plaintiffs' injuries and damages.

151.   Plaintiffs' claims exceed the jurisdictional limits of the Court.

**VI.   CLAIMS FOR RELIEF**

### FIRST CAUSE OF ACTION

**Strict Products Liability – Failure To Warn under
the Connecticut Products Liability Act**

152.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth here and further allege as follows:

153.    Defendants had a duty to warn Plaintiff and her ophthalmologists about the dangers of the Trulign Lenses of which they knew, or in the exercise of ordinary care, should have known, at the time the Trulign Lenses left the Defendants' control.

154.    Defendants did know of these dangers of use of the Lenses, and breached this duty by failing to warn Plaintiff and her ophthalmologists of the dangers of its use in cataract surgery.

155.    As a direct and proximate result of one or more of the above listed dangerous conditions and defects, Plaintiffs sustained serious injuries of a personal and pecuniary nature from approximately the date of the first surgery through the present and long into the future.

156.    Plaintiff sustained extreme pain, suffering, and anguish from the date of her cataract surgeries through the present.

157.    As the direct, proximate and legal cause and result of Defendants' misconduct relating to Trulign Toric Lenses and Defendants' dangerous and irresponsible marketing and promotion practices, Plaintiffs have been injured and have incurred damages including, but not limited to, medical and hospital expenses, lost wages and lost earning capacity, physical and mental pain and suffering, loss of the enjoyment of life and loss of consortium.

158.    Plaintiff Mrs. Glover has been injured and suffers injuries and continuously degrading injuries to her eyes, the exact nature of which are not completely known to date; Plaintiffs have sustained economic losses, including loss of earnings and diminution of   the loss of earning capacity, the exact amount of which is presently unknown; Plaintiff will be required to incur additional medical expenses in the future to

care for herself as a result of the injury and damages she has suffered; and,   Plaintiff Charles Glover has lost the society, comfort and consortium of his beloved wife.

159.   Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

160.   Plaintiffs seek injunctive relief to force Defendants to cease sales of these dangerous and defective Lenses.

161.   Defendants' conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.   Such conduct was directed specifically at Plaintiffs and as such, warrants an imposition of punitive damages.

## SECOND CAUSE OF ACTION

### Negligence – Under Connecticut Products Liability Act

162.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth here and further allege as follows:

163.   Defendants marketed their Trulign Lenses to and for the benefit of Plaintiff, and additionally marketed it to her ophthalmologists, and these Defendants knew or should have known that Plaintiff and her ophthalmologists would use their product for cataract surgery.

164.   Defendants owed Plaintiff and her ophthalmologists duties to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing best scientific knowledge.

165.    Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Defendants breached their duties to Plaintiff and to her ophthalmologists.

166.    The following sub-paragraphs summarize, *inter alia*, these Defendants' breaches of duties to Plaintiff and her ophthalmologists and describe categories of acts or omissions constituting breaches of duty by these Defendants.   Each and/or any of these acts or omissions establishes an independent basis for these Defendants' liability in negligence:

a.     Unreasonable and improper promotion and marketing Trulign Lenses to ophthalmologists, including but not limited to the promotion and marketing of the Lenses without testing;

b.     Failure to warn ophthalmologists and Plaintiff of the dangers associated with the Lenses including, but not limited to, development of the Z Syndrome, permanent scarring of the eye, and permanent and impairment of vision, and inability to remove, replace or exchange implanted Lenses from the eye as well as the need for painful therapies to attempt to repair the eyes;

c.     Failure to exercise reasonable care by not complying with federal law and regulations applicable to the sale and marketing of Trulign Lenses;

d.     Failure to maintain adequate records of complaints having to do with the implantation of the Lenses;

e.     Failure to report adverse events to the FDA as required by the conditional approval of the devices;

38

f.      Failure to investigate reported adverse events and inform the FDA and the medical community about those adverse events;

g.      Failure to adhere to FDA's requirements; and

h.      Failure to manufacture the Lenses employing the required good manufacturing practices.

167.    Defendants knew, or should have known, that, due to their failure to use reasonable care, Plaintiff and her ophthalmologists would use and did use the Trulign Lenses to the detriment of Plaintiff's health, safety and well-being.

168.    As the direct, producing, proximate and legal cause and result of Defendants' negligence, Plaintiffs suffered severe injuries and losses.

169.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

170.    Plaintiffs seek injunctive relief to force Defendants to cease sales of these dangerous and defective Lenses.

171.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others. Such conduct was directed specifically at Plaintiffs and was such as warrants an award of punitive damages.

## THIRD CAUSE OF ACTION

### Loss of Consortium

172.    Plaintiffs hereby incorporate each of the preceding paragraphs as if fully set forth herein.

2463880.5

173.    Plaintiff Charles Glover is, and at all times herein mentioned was, the lawful spouse of Plaintiff Mrs. Glover.

174.    As a direct, legal, and proximate result of the culpability and fault of Defendants, be such fault through strict liability or negligence, Plaintiff Charles Glover suffered the loss of support, service, society, and other elements of consortium, all to his general damage in an amount in excess of the jurisdictional minimum of this Court.

175.    As alleged above, the Defendants knew and had reason to know that the implantation of the Trulign Lenses could cause serious injuries to Plaintiff Marjorie Glover, and other consumers like her, and to Charles Glover and other spouses like him. Defendants consciously disregarded this increased risk of harm by failing to warn of such risks and by continuing to market, promote, sell and defend the Trulign Lenses.

## VII.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS AND PUNITIVE DAMAGES ARE PROPER IN THIS CASE.

176.    Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint.

177.    Plaintiffs suffered illnesses that have latency periods and do not arise until many years after exposure. Plaintiff's illnesses did not distinctly manifest as having been caused by the Trulign Toric Lenses until Plaintiff was made aware that her injuries could be caused by use of the Defendants' Trulign Toric Lenses.   Consequently, the discovery rule applies to this case and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know that ovarian cancer was linked to the use of the Trulign Toric Lenses.

178.    Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct. Through their

2463880.5

affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with Trulign Toric Lenses.

179.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know, or could not have reasonably learned through reasonable diligence, that Plaintiff has been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

180.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of Trulign Toric Lenses. Defendants were under a duty to disclose the true character, quality and nature of Trulign Toric Lenses because this was non-public information which the Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to Plaintiff.

181.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable Trulign Toric Lenses, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

182.    In representations to the Plaintiff and the public in general, Defendants also fraudulently concealed and intentionally omitted the following material information:

- •    that the Trulign Toric Lenses were not as safe as other products available;

- •    that the Trulign Toric Lenses were dangerous; and

•     that the Trulign Toric Lenses were defectively and negligently designed and had defective, inadequate, and insufficient warnings and instructions.

183.    Defendants were under a duty to disclose to Plaintiff, and the public in general, the defective nature of the Trulign Toric Lenses.

184.    Defendants made the misrepresentations and actively concealed information concerning the safety and efficacy of the Trulign Toric Lenses with the intention and specific desire to induce the consumers, including the Plaintiff, to rely on such misrepresentations in selecting, purchasing and using the Trulign Toric Lenses.

185.    Defendants made these misrepresentations and actively concealed information concerning the safety and efficacy of the Trulign Toric Lenses in the labeling, advertising, promotional material or other marketing efforts.

186.    These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

187.    The misrepresentations and active concealments by Defendants were perpetuated directly and indirectly by Defendants, its sales representative, employees, distributors, agents, marketers and detail persons.

188.    At the time the representations were made, Plaintiff did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Trulign Toric Lenses. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

189.    Defendants knew that Plaintiffs, and the public in general, had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the Trulign Toric Lenses, as set forth herein.

190.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Trulign Toric Lenses, Plaintiff would not have purchased, used, or relied on Defendants' Trulign Toric Lenses.

191.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and Plaintiff.

192.    The information distributed to the public and Plaintiff by Defendants included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Trulign Toric Lenses.

193.    Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the Trulign Toric Lenses, specifically that the Trulign Toric Lenses did not have dangerous and/or serious adverse health safety concerns, and that the Trulign Toric Lenses were as safe as other products.

194.    Defendants' intent and purpose in making these misrepresentations was to deceive the Plaintiffs; to gain the confidence of the public, the medical community, and

Plaintiffs, to falsely assure them of the quality and fitness for use of the Trulign Toric Lenses; and induce Plaintiffs and the public to use the Trulign Toric Lenses.

195.   Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Trulign Toric Lenses to the public at large, for the purpose of influencing the sales of Trulign Toric Lenses known to be dangerous and defective, and/or not as safe as other alternatives.

196.   At all times relevant to this action, Defendants knew that the Trulign Toric Lenses were not safe for consumers.

197.   The misrepresentations and active concealment by Defendants constitute a continuing tort. Indeed, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the Trulign Toric Lenses.

198.   As a result of the Defendants' advertising and marketing efforts, misrepresentations and omissions, the Trulign Toric Lenses are and continue to be pervasively manufactured and used in California and throughout the United States.

199.   The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of Plaintiffs and other users of the Trulign Toric Lenses and for the primary purpose of increasing Defendant's profits from the sale and distribution of the Trulign Toric Lenses. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

2463880.5

200.    Prior to the manufacturing, sale and distribution of the Trulign Toric Lenses, Defendants, and each of them, knew that the Trulign Toric Lenses were in a defective condition as previously alleged herein and knew that those who were prescribed the Trulign Toric Lenses would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants and each of them through its officers, directors, managers, and agents, had knowledge that the Trulign Toric Lenses presented a substantial and unreasonable risk of harm to the public, including Plaintiff and, as such, consumers of the Trulign Toric Lenses were unreasonably subjected to risk of injury.

201.    Despite such knowledge, Defendants, and each of them, acting through its officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly and deliberately failed to remedy the known defects in the Trulign Toric Lenses and failed to warn the public, including the Plaintiff, of the extreme risk of injury occasioned by said defects inherent in the Trulign Toric Lenses. Defendants and its individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the Trulign Toric Lenses knowing that the public, including Plaintiff, would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

202.    Defendants' conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for safety, entitling Plaintiffs to exemplary damages.

203.    Plaintiffs filed this lawsuit within the applicable limitations period of first suspecting that the Trulign Toric Lenses were the cause of any appreciable harm

2463880.5

sustained by Plaintiffs, within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries.   Plaintiffs could not, by the exercise of reasonable diligence, have discovered any wrongdoing and could not have discovered the causes of the injuries at an earlier time because the injuries occurred without initial perceptible trauma or harm and, when the injuries were discovered, the causes were not immediately known.   Plaintiffs did not suspect, nor did they have reason to suspect, that wrongdoing had caused the injuries until recently.   Plaintiffs filed the original action within one-year of discovering the causes of action and identities of Defendants.

204.   Plaintiff had no knowledge of the defects in the Trulign Toric Lenses or of the wrongful conduct of Defendants as set forth herein, nor did Plaintiffs have access to information regarding other injuries and complaints in the possession of Defendants. Additionally, Plaintiffs were prevented from discovering this information sooner because Defendants misrepresented and continue to misrepresent to the public that the Trulign Toric Lenses are safe and free from defects. Defendants fraudulently concealed information that would have allowed Plaintiffs to discover a potential cause of action sooner.

205.   Plaintiff has reviewed their potential legal claims and causes of action against the Defendants and intentionally choose   only to pursue claims based on state law.   Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question.   Plaintiffs choose to only pursue claims based on state law and are not making any claims that raise federal questions.

WHEREFORE, Plaintiffs demand judgment against Defendants as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, and as appropriate to each cause of action alleged, as follows:

      a.      For injunctive relief, including removal of the dangerous and defective Trulign lens from the market;

      b.      For declaratory relief, declaring that the Trulign Toric Lenses are defective as a matter of law;

      c.      Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

      d.      Past and future economic and special damages according to proof at the time of trial;

      e.      Loss of earnings and impaired earning capacity according to proof at the time of trial;

      f.      Medical expenses, past and future, according to proof at the time of trial;

      g.      Compensatory damages for past and future mental and emotional distress, according to proof;

      h.      For loss of consortium;

      i.      For punitive or exemplary damages according to proof at the time of trial;

      j.      For attorneys' fees and costs of suit incurred herein;

      k.      For pre-judgment interest as provided by law; and

l.      For such other and further relief as the Court deems equitable or appropriate under the circumstances.

2463880.5

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs demand a trial by jury on all issues stated.

Respectfully submitted,

Dated:    October 17, 2022

_____
Fabrice N. Vincent
(*pro hac vice*)

Fabrice N. Vincent (*pro hac vice*)
fvincent@lchb.com
LIEFF CABRASER
HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA   94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Wendy R. Fleishman (*pro hac vice*)
wfleishman@lchb.com
Daniel Seltz ((*pro hac vice anticipated*)
LIEFF CABRASER
HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Hugh W. Cuthbertson    ct04133
hcuthbertson@zcclawfirm.com
Glenn A. Duhl    ct03644
gduhl@zcclawfirm.com
Zangari Cohn Cuthbertson
Duhl & Grello P.C.
59 Elm Street, Suite 400
New Haven, CT 06510
Telephone: (203) 789-0001
Facsimile: (203) 782-2766

*Attorneys for Plaintiffs Marjorie
and Charles Glover*

2463880.5

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of October, 2022, a copy of the foregoing Second Amended Complaint for Injunctive Relief and Damages was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

_____
Fabrice N. Vincent
(*pro hac vice*)

2463880.5